## LOUISVILLE & NASHVILLE RAILROAD COMPANY v. MRS. CARRIE BELL EVINS.

Middle Section. August 6, 1930.

Petitions for Certiorari by both parties denied by Supreme Court, May 2, 1931.

Ed T. Seay and Sidney F. Keeble, both of Nashville, for plaintiff in error.

Pitts, McConnico & Hatcher, of Nashville, for defendant in error.

FAW, P. J. The Louisville & Nashville Railroad Company (defendant below, and, for convenience, hereinafter called defendant) has brought this case here by an appeal in the nature of a writ of error

60

from a judgment against it and in favor of Mrs. Carrie Bell Evins (the plaintiff below and hereinafter called plaintiff) for twenty-five thousand dollars and the costs of the cause.

The action was brought in the Circuit Court of Davidson County on November 12, 1926, against defendant Railroad Company and the County of Davidson, but a demurrer on behalf of the County was sustained and the suit was thereafter prosecuted against the Railroad Company alone.

The case was tried to a jury upon the issues made by defendant's plea of not guilty to the plaintiff's declaration. At the close of all the evidence the defendant moved the Court "to direct the jury peremptorily to return a verdict in favor of the defendant, upon the grounds, that there is no evidence in the record sufficient to support a verdict in plaintiff's favor for any amount; that, taking the evidence, and all reasonable inferences and deductions therefrom, in its strongest light in plaintiff's favor, there is no evidence to justify a verdict, or sufficient to support a verdict;" which motion was overruled and the jury, after argument of counsel and the charge of the Court, found the issues in favor of the plaintiff and assessed her damages at $25,000. Thereafter, the trial court overruled a motion for a new trial seasonably made on behalf of defendant, which motion embraced, as asserted grounds for a new trial below, all of the matters presented by the twenty-four assignments of error filed by defendant in this Court.

It is insisted, on the brief for plaintiff, that no one of defendant's assignments of error conforms to the Rules of this Court or the law, and that, for that reason, they should all be overruled. The chief criticism of the defendant's assignments, in this connection, is that neither of them, in expressed terms, challenges the action of the trial court in overruling defendant's motion for a new trial. The contention of plaintiff on this point may be seen from an excerpt from the brief of her counsel, as follows:

"Since it is the overruling of the motion for a new trial that gives the right to the appellate court to review the trial court upon any question of fact or other question necessary to be brought into the record by a Bill of Exceptions,—it necessarily follows from this that the Assignments of Error in the appellate court must be aimed at and expressly assault as erroneous—(and for the same cause stated in the motion for a new trial)—the erroneous action of the trial judge in overruling the motion for a new trial."

Subsection 4 of Rule 11 in the printed Rules of this Court provides that:

"No assignment of error in any case brought to this Court for review can be predicated upon any alleged error of the trial court

consisting of an omission or affirmative action in the organization of the court or jury, or for any defect in the pleadings, or for any mistake, irregularity or error in the conduct of the case, unless it affirmatively appears in the record that the omission, action, defect, or error was seasonably called to the attention of the trial judge and ruled on adversely to the party complaining, otherwise same will be treated as having been waived, or cured in the trial court.''

And subsection 5 of the same Rule is as follows:

''Error in the admission or exclusion of testimony, in charging a jury, or refusing further instructions, misconduct of jurors, parties or counsel; or other action occurring or committed on the trial of the case, or other ground upon which a new trial is sought, will not constitute a ground for reversal and a new trial, unless it affirmatively appear that the same was specifically stated in the motion made for a new trial in the lower Court, and decided adversely to the plaintiff in error, but will be treated as waived; nor will any supposed matter in arrest of judgment be considered unless it appears that the same was specifically stated in a motion, seasonably made in the trial court, for that purpose, and held insufficient.'' 151 Tenn., pp. 815-816. (The Rules of the Court of Appeals are also published in the Appendix to 155 Tennessee Reports, and published as an Appendix to each of the first 11 volumes of the Tennessee Appeals Reports.)

The Supreme Court has long had the same Rules (see 126 Tenn., pages 722-723, and Appendix to 155 Tenn.), which Rules are merely the declaration of a rule of practice previously established by repeated decisions of the Supreme Court. Board v. Railway, 148 Tenn. 676, 257 S. W. 91, and other cases there cited.

This Court has not heretofore construed the above quoted Rules, or the decisions upon which they are based, as requiring that the assignments of error must necessarily, in terms, ''assault as erroneous'' the action of the trial judge in overruling the motion for a new trial. Whether the appeal is from the judgment (as expressly stated in Railroad v. Ray, 124 Tenn., 16, 28, 134 S. W., 858, and Bostick v. Thomas, 137 Tenn., 99, 101, 191 S. W., 968), or from the order overruling the motion for a new trial (as seems to be suggested in Hamburger v. Railroad, 138 Tenn., 123, 131, 196 S. W., 144), we think the reason for the Rule is met when, as in the instant case, the record discloses a motion for a new trial seasonably made in the lower court, and ruled adversely to the plaintiff in error, which motion specifically and clearly challenged as erroneous the rulings of the trial court assailed by the assignments of error filed in this Court; and we are not aware of any holding of the Supreme Court inconsistent with this view. We therefore hold that defendant's assignments of error are not fatally defective because of the omission

of a specific assertion therein that the trial court erred in overruling the motion for a new trial.

Shortly before daylight on the morning of Sunday, October 10, 1926, the dead body of B. W. Evins was found beside the railroad track at the bottom of a cut about twenty-five or thirty feet deep on the line of defendant's railroad in the unincorporated suburban village of Flat Rock, south of the City of Nashville. The plaintiff, Mrs. Carrie Bell Evins, the widow of said B. W. Evins, thereafter brought this suit, on behalf of herself and the two infant children of the deceased, for $50,000 as damages, alleging that the death of her deceased husband was caused by negligence of the defendant in certain particulars set forth in her declaration, which will be presently stated. On the trial below, there was proof of circumstances from which the jury might well have found that the deceased fell or was precipitated into the cut between seven and seven-thirty o'clock in the evening of Saturday, October 9, 1926. At the trial, the parties stipulated, in writing, that:

"The dead body of the plaintiff's husband, Mr. Evins, was found lying on the ground near the railroad track at the bottom of the cut in question, and among other injuries, it was then discovered that he had a crushed head and a broken neck; and it is stipulated that, following those injuries to the head and neck, whenever they occurred, that death was instantaneous."

The cut in which plaintiff's husband met his death was a part of the construction of the main line (a double track railroad at this point) of the Lewisburg & Northern Railroad Company, built by that Company, a few years prior to the year of 1915, southward from the City of Nashville through the village of Flat Rock and (a little further south) through the railroad yards, known as the "Radnor Yards," and thence southward.

On October 1, 1915, by deed duly registered, the Lewisburg & Northern Railroad Company conveyed to the defendant Louisville & Nashville Railroad Company its entire line of railroad etc., and all its properties, rights, privileges and franchises, "except its right to be or to continue to exist as a corporation." Upon the execution of said deed by the Lewisburg & Northern Railroad Company, the defendant Louisville & Nashville Railroad Company went into possession of the railroad and other properties thereby conveyed, and has at all times since owned and operated same. For the purposes of this case, we will assume that defendant Louisville & Nashville Railroad Company is not only vested with all the rights, but charged with all the duties and subject to all the liabilities, with respect to the ownership, maintenance and operation of the railroad and other properties thus acquired, to which the Lewisburg & Northern Railroad Company would have been subject if it had continued to own

and operate said railroad and other properties, and had been owning, maintaining and operating same at the time of the death of B. W. Evins.

Conversely, the defendant Louisville & Nashville Railroad Company was, at the time of the death of B. W. Evins, charged with the same duties and subject to the same liabilities with respect to the ownership, maintenance and operation of said railroad and other properties as if it had originally constructed the railroad and had continuously owned, maintained and operated same since its construction.

At the time the construction of the railroad (there being but one line of railroad involved in this case) was commenced, Melrose Avenue and Caldwell Avenue were public highways in the village of Flatrock, and (according to the record) intersected each other at right angles. Caldwell Avenue, throughout the territory necessary to be taken into view in this case, was the first street west of and parallel to the Nolensville Pike, on which Pike there was a street railway track over which electric street cars were operated between the City of Nashville and the Radnor Yards.

At the point where B. W. Evins's body was found, and for a considerable distance in either direction therefrom, the course of the railroad is practically north and south. But before the railroad was built, the course of Caldwell Avenue, from its intersection with Melrose Avenue, was, in one direction, somewhat west of north, and, in the other direction, somewhat east of south; and the course of Melrose Avenue, from its intersection with Caldwell, was, in one direction, somewhat south of west, and, in the other direction, somewhat north of east.

The railroad was so located with respect to the intersection of Melrose Avenue and Caldwell Avenue that (if these two streets had remained on their original courses) it would have crossed Caldwell Avenue approximately one hundred and twenty-five feet south of the intersection and would have crossed Melrose approximately one hundred and twenty-five feet east of the intersection, and, as the railroad tracks were in a deep cut at each of these crossings, it would have been incumbent on the Railroad Company to build and thereafter maintain two bridges—one on Caldwell Avenue and one on Melrose Avenue. Dyer County v. Railroad, 87 Tenn., 712, 11 S. W., 943.

But, instead of building a bridge on each of the two avenues (Caldwell and Melrose), the Railroad Company, by purchase, acquired the four blocks of lots centering at the intersection of Melrose and Caldwell Avenues, and altered the course of each of said avenues in such way that it was necessary to build but one bridge in order to serve the purpose of both avenues. This was accomplished

by putting a slight curve in Melrose Avenue and an elbow in Caldwell Avenue; that is to say, Melrose Avenue, eastwardly from its intersection with Caldwell, was curved toward the south, crossed the railroad cut (on a bridge) at right angles, and, at the eastern end of the bridge, resumed its former direction (but on a new location) northeastward to the Nolensville Pike. That part of Caldwell Avenue which extended southwardly from Melrose prior to the construction of the railroad was closed to public travel and discontinued and abandoned as a highway, and was opened on a new location east of and parallel with the railroad, southward from Melrose Avenue.

The bridge was built and the aforesaid changes in the location of Melrose and Caldwell Avenues were made in the year of 1911—about fifteen years before the death of plaintiff's husband. The bridge was built of concrete, eighty-three feet long, 49.6 feet wide, with a concrete wall, approximately four feet high, on either side. There were concrete sidewalks, about nine feet wide, for pedestrians, on either side, leaving a roadway for vehicles, approximately thirty feet wide, between the curbs.

It is not claimed in the record that the bridge itself, as constructed and maintained, was not a substantial, commodious and safe structure, entirely sufficient for the purposes for which it was designed. The gist of plaintiff's complaint is that the death of her husband was proximately caused by the failure of defendant to maintain a fence, guard rail, or sufficient barrier of some sort, from the southwest corner of the bridge westward along the south side of Melrose Avenue, and southward along the top edge or brow of the cut. In her declaration, after reciting the aforesaid changes in Melrose Avenue and Caldwell Avenue, and the construction of the bridge, plaintiff avers that:

"Under the law of Tennessee as set out in chapter 142 of the Acts of Tennessee for the year 1875, and in chapter 119 of the Acts of Tennessee for the year 1889, and in chapter 356 of the Acts of Tennessee for the year 1899, the railroad company constructing said double track line of railroad, and its successor, the defendant, Louisville & Nashville Railroad Co., at all times owning and operating said line of railroad after the year 1915, were under the legal duty to construct and thereafter at all times maintain over said deep cut and excavation at the point where same crossed the public highway and thoroughfare known as Melrose Avenue aforesaid, a bridge which was and would be reasonably sufficient, safe and convenient for the passage of the traveling public using said Melrose Avenue, and traveling on and along the same in vehicles or on foot; and it was the duty of the

defendant Railroad Company, on October 9, 1926, and at all times prior thereto after said defendant became the owner and operator of said line of railroad to make, have and furnish a good and sufficient crossing on said public highway known as Melrose Avenue, and keep same in lawful repair at its own expense for the use of the traveling public.''

Then, after further describing the bridge and its immediate surroundings, plaintiff makes the averments upon which she seeks to predicate her action, as follows:

''Said bridge and the approach thereof on the western side are at a considerable angle with both said Melrose Avenue and said Caldwell Avenue, so that said bridge and the approaches thereof are not in line with either of said avenues. There is no sidewalk on either side of Melrose Avenue where the same joins said bridge or the approach to the same at the western end of said bridge, but there is a path along the south side of Melrose Avenue and along the south side of the approach to said bridge at the western end of the bridge, running thence west from the concrete sidewalk on the southern side of said crossing bridge, which path, as well as all of the macadamized portion of said Melrose Avenue, west of said bridge, is used by pedestrians in traveling along said Melrose Avenue and approaching said bridge from the west, and in going upon said bridge on the middle traveled portion thereof, as well as on the concrete sidewalk on the south side of said bridge. The defendant Railroad Company, on October 9, 1926, and for a long time prior thereto, in addition to its duty to keep and furnish a good and sufficient crossing on Melrose Avenue over and across said railroad cut and excavation, as required by the laws of Tennessee, including the statutes herein before referred to, was also owning the adjoining vacant land situated and lying along the northern and southern sides of the western approach and traveled ways constituting the western approach to said bridge and along the brow or edge of the deep railroad cut and excavation extending under said bridge and both northwardly and southwardly from said bridge for long distances, and also owning the brow, sides and walls of said railroad cut and excavation; and it was the duty of the defendant railroad company, on October 9, 1926, and prior thereto, to exercise such care over said railroad bridge and crossing, and the traveled ways constituting the western approach to said bridge and crossing, and its adjoining land lying eastwardly, northerly and southerly from the western end of said bridge, as would furnish to the traveling public, the safe, convenient, good and sufficient crossing required by the laws of this State hereinbefore referred to.

This duty, the defendant railroad company, on October 9, 1926, and for long prior thereto, was wrongfully and negligently failing and refusing to perform. On and prior to said last mentioned date the defendant was neglecting to have and maintain any such safe, good or sufficient crossing, and was maintaining said bridge setting at an angle and out of line with both Melrose Avenue and Caldwell Avenue to the west of said bridge; and defendant, at the same time, was wholly neglecting to have and maintain any fence or guard rail at the southwestern end of said bridge, or leading therefrom along the southern margin or side of the approach to said bridge or along the westwardly brow or top edge of said deep railroad cut and excavation running under said bridge and on southwardly therefrom; and said defendant railroad, on October 9, 1926, and for a long time prior thereto, was negligently doing and refraining from doing the things aforesaid, notwithstanding there was no light maintained anywhere in the region and neighborhood of said bridge and the western end and approach thereof; and the defendant was negligently doing and refraining from doing these things, when it knew, or in the exercise of ordinary care should have known, that anyone approaching said bridge from the west, and traveling in the dark, would be exposed to the imminent danger and peril of being unable, in the dark, to hit the western end of said bridge, and would be so exposed to the imminent danger and peril, while attempting to use said bridge by approaching same from the west, of being precipitated over the top edge of said railroad cut or embankment, and down many feet, to-wit, twenty-five (25) feet and more, into the bottom of said railroad cut or excavation, as same existed and was maintained by the defendant southwardly or southeastwardly from said bridge structure and the western approach thereto and the southwestern corner thereof. All of the aforesaid highly dangerous and negligent construction and conditions were allowed and permitted by the defendant to exist on October 9, 1926, and for many months prior thereto, notwithstanding, the defendant Railroad Company then, and for long prior thereto, knew, or in the exercise of ordinary care ought to have known, that its said unsafe and dangerous maintenance of the western end of said bridge and the traveled ways and approaches leading thereto, had exposed and were exposing members of the traveling public, and particularly pedestrians attempting to approach said bridge from the west and use same in the nighttime to the great and imminent danger and peril aforesaid; and said negligent and dangerous condition of said railroad bridge and crossing, at and in the vicinity of the southwestern corner of said railroad bridge and crossing,

was, on October 9, 1926, and for long prior thereto had been, a constant menace to the safety and lives of the traveling public, approaching said railroad bridge and crossing from the west and attempting to use same in the dark, and was on said last mentioned date, and long had been, a dangerous private and public nuisance so maintained and permitted to exist by the defendant Railroad Company, in violation of the laws of this State hereinbefore referred to.

(4) Shortly, to-wit, about a week or such matter, before October 9, 1926, plaintiff's husband, Bertie W. Evins, and plaintiff and their two children, moved to and began to occupy as their home a cottage on the west side of Caldwell Avenue, and north of said Melrose Avenue, and in the angle made by these two avenues,—said home or cottage being located some distance, to-wit, one hundred and fifty (150) feet or more, westwardly from the western end of said railroad crossing and bridge. Persons leaving said home or cottage would travel, and by the defendant were expected to travel, eastwardly out towards the Nolensville Pike by going along Melrose Avenue, and over and along the western approach to said railroad crossing and bridge, and thence eastwardly over said bridge, and on eastwardly along Melrose Avenue to said Nolensville Pike, whereon was located an electric car line which, for a small charge, would carry persons and passengers into the City of Nashville; and said Melrose Avenue, including said railroad bridge and crossing, and the traveled ways constituting the western approach thereto, on October 9, 1926, and for long prior thereto, was a frequently used public street, highway and thoroughfare, commonly and frequently used by the traveling public and particularly by pedestrians in the neighborhood of said home and cottage which plaintiff's said husband and family began to occupy a few days before October 9, 1926, as aforesaid. Plaintiff's said husband, Bertie W. Evins, was at home very little, in the daytime. He was a locomotive fireman, and in going to and coming from his work, at the beginning and expiration of his run on the railroad, he, prior to said October 9, 1926, had not traveled over said bridge and the traveled ways constituting the western approach thereof, except upon a very few occasions, and was unfamiliar with same and with the conditions surrounding same.

(5) At or about the hour of seven (7) o'clock P. M., or shortly thereafter, on the night of October 9, 1926, plaintiff's said husband, Bertie W. Evins, had occasion to go from their home on Caldwell Avenue, situated to the west of said railroad bridge and crossing, to the street car line on the Nolensville Pike some

distance beyond the eastern end of said railroad bridge or crossing. Plaintiff's said husband on said occasion left their said home, when it was very dark, and undertook to proceed on foot from his said home, in an easterly direction, and undertook to travel over the ways constituting the western approach of said railroad bridge crossing, for the purpose of proceeding across said bridge to go on eastwardly along Melrose Avenue to its junction with the Nolensville Pike in said County, whereon was situated the street car line aforesaid. When plaintiff's said husband arrived at a point near the western end of said railroad bridge or crossing, and while he was using due care and caution for his own safety, and without any negligence on his part, was attempting to approach and use said railroad bridge and crossing from its western end, plaintiff's said husband inadvertently and in the dark failed and was unable exactly to hit the western end of said bridge, and so, in the dark, and while in the exercise of ordinary care upon his part, and while attempting to approach and use said railroad bridge and crossing from its western end, slipped or stumbled or was precipitated or went over the western top edge or brow of said deep railroad cut or excavation, at a point near the southwestern corner of said railroad bridge or crossing structure, and was thereby caused to fall many feet, to-wit: twenty-five (25) feet and more, down to the bottom of said defendant's deep railroad cut or excavation, and by this fall plaintiff's said husband, was broken, bruised, mangled and crushed in his head, neck, shoulders and all the parts of his body; and was thereby caused to suffer great pain in mind and body, and was caused to die, and his dead body was discovered lying at the bottom of defendant's deep railroad cut and excavation about daylight, or sometime thereafter, on the next morning, October 10, 1926.

(6) Plaintiff avers that the said accident and the death of her said husband, Bertie W. Evins, was caused by the unlawful, wrongful and negligent conduct of defendant, Louisville & Nashville Railroad Company, in then and long theretofore, having, maintaining and permitting to exist, the highly dangerous and negligent condition of said bridge at and surrounding the western end thereof and the ways constituting and theretofore used by the traveling public and pedestrains as the western approach or approaches thereto, and particularly by the highly dangerous and negligent conditions then long maintained and permitted by the defendant in the region and vicinity of the southwestern corner of said railroad bridge and crossing which defendant was then and long had been undertaking, and under the legal duty, to provide for the use of the traveling public, and particularly

for the use of pedestrians, attempting to approach and use said railroad bridge and crossing from its western end.

(7) The plaintiff's husband, Bertie W. Evins, was a young man in the prime of life, who would have been twenty-eight (28) years of age on the 29th day of December, 1926. He was strong and vigorous, and a young man of fine health, vigor and habits of industry and sobriety. He was ambitious and industrious, and at the time of his said death was employed by the Tennessee Central Railroad Company as a locomotive fireman, and had been employed by said company for the preceding ten (10) years, and at the time of his death was earning one hundred and seventy-five ($175) dollars per month or more, and was in the line of promotion, and would have earned much more if he had lived, and his expectancy of life was a long one, and particularly was this true considering his fine state of health and his exemplary habits.

(8) Plaintiff's said husband, Bertie W. Evins, left surviving him the plaintiff, Carrie Bell Evins, his widow, and two infant children, Bertie W. Evins, Jr., and John Starling Evins.

(9) The plaintiff, widow of the said Bertie W. Evins, brings this suit for the benefit of herself and her said two infant orphan children. Defendant, though liable, refuses to pay, and therefore plaintiff sues the defendant for fifty thousand ($50,-000) dollars as damages, and demands a jury to try this cause.''

The contentions of the defendant Railroad Company are epitomized in two paragraphs of its brief, as follows:

''The defendant Railroad Company insists that there were no defects in the bridge nor its approaches. That it furnished a good and sufficient crossing for use of travelers on the highway. That it was under no legal duty to put up fences or barriers at the southwest corner of the bridge or along the edge of the cut, and it was not guilty of any negligence whatsoever in any of the matters claimed by plaintiff as constituting negligence.

''The defendant further insists that the negligence of the deceased directly caused and contributed to the injury, and barred any recovery by the plaintiff.''

It is an elementary principle, applicable in negligence cases, that the liability of the defendant, if any there is, rests primarily upon the theory that the defendant failed to discharge a duty which, under the law, he owed to the plaintiff. Williams v. Nashville, 106 Tenn., 533, 538, 63 S. W. 231; Warehouse, etc., Co. v. Anderson, 141 Tenn., 288, 296, 210 S. W., 153; Kershaw Motor Co. v. Southern Railway Co. (S. C.) 47 A. L. R., 858, 860.

''Where such duty does not exist, however unfortunate the injured may be, and free from negligence, yet he must alone

bear the consequences; he cannot impose them upon one under no obligation in law towards him, save not to inflict, directly or indirectly, wanton injury upon him.'' Williams v. Nashville, supra, p. 538.

It, therefore, becomes material to inquire whether, under the law, the defendant Railroad Company owed to the plaintiff's deceased husband the duty of erecting and maintaining a fence, or other barrier, (1) from the southwest corner of the bridge westward along the southern margin of Melrose Avenue, or (2) from the southwest corner of the bridge southward along the top edge or brow of the cut?

These inquiries demand the ascertainment of the nature, extent and limits of the legal duty of the defendant (1) with respect to the maintenance of the bridge and its approaches as a part of an established highway crossed by the defendant in the construction of its railroad, and (2) arising out of its ownership of the land south of Melrose Avenue through which the cut in question was excavated.

The above-mentioned two separate and independent bases for the claimed liability of the defendant are clearly asserted in that part of plaintiff's declaration hereinbefore quoted; and in the plaintiff's brief it is said:

"It will be remembered that in this case the Railroad Company was not only charged with the primary duty of keeping said bridge and the approaches thereto reasonably safe in any event as a part of the *highway* known as Melrose Avenue,— but the Railroad Company also, as a *private abutting owner,* owned the land immediately adjoining the southwest corner of this bridge and between said highway and the unguarded edge of the railroad cut in question which it was maintaining on its own land.

So the appellant Railroad Company, in this case was onerated not only with the duty of keeping said *highway* safe, but also with the duty imposed by the law upon a *private abutting owner* not to permit, on his private property, an unguarded pit or precipice so near to a highway, that one trying to use the highway in the exercise of ordinary care would be exposed to the danger of *accidentally* and *unintentionally* falling into such near pitfall and precipice." (The italicizing in the foregoing quotation indicates the words italicized in the brief.)

The defendant's duty with respect to the maintenance of the bridge and its approaches, and its duty as the owner of land abutting on the highway, rest, respectively, on different considerations, and are governed, in important respects, by different principles.

It will be remembered that plaintiff, in her declaration, predicates

the duty of defendant to construct and maintain "a bridge which was and would be reasonably sufficient, safe and convenient for the passage of the traveling public using said Melrose Avenue," etc., upon three Tennessee statutes which will now be noticed.

We learn from plaintiff's brief that the mention, in the declaration, of chapter 142 of the Acts of 1875 was intended as a reference to a paragraph of section 6 of said Act (carried into Shan. Code as sec. 2417) as follows:

"The line or track of the road shall be so constructed as not to interfere with the convenient travel of the public along the highways, county roads, streets, and alleys of cities, towns, and villages, and so as to allow carts, wagons, carriages, and other vehicles conveniently and safely to pass over or under the line or track, and so as not to interrupt traveling on foot or horseback, or in vehicles of any kind, from the necessary and proper use of the public road, street, or alley in the usual and proper mode for their convenience."

Chapter 142 of the Acts of 1875 is known as the General Incorporation Act, and section 6 thereof contains the form of charter for a railroad or railway company. It appears that the Lewisburg & Northern Railroad Company was a Tennessee corporation, and, presumably, the paragraph above quoted was a part of its charter.

Section 1 of the Act of 1889, ch. 119, provides that:

"All persons, companies, corporations, or syndicates, owning or operating a railroad or railroads in the State of Tennessee, be required to make and furnish good and sufficient crossings on the public highways crossed by them, and keep same in lawful repair at their own expense."

Section 2 of said Act provides that:

"A failure to observe and fully comply with the provisions of the first section of this Act shall subject the offender to a fine of not less than ten nor more than one hundred dollars, and the grand juries of the State shall have inquisitorial powers to investigate any violations of the provisions of this Act, as now allowed by law in other misdemeanors; provided, that this Act shall not apply to crossings within the corporate limits of towns or cities."

It may be said here that, insofar as the aforesaid Act of 1889 applies to the construction of a railroad across an established public highway, as in the instant case, it was, with respect to the duty imposed, in substance, merely declaratory of the common law (Dyer County v. Railroad, supra), but it enlarged the penalty for failure to discharge the duty imposed by declaring such failure a misdemeanor punishable by fine.

Section 1 of chapter 356 of the Acts of 1899 provides that:

"Every company or corporation or person operating a line of railroad within the State of Tennessee shall be required to grade to a level with the rails of said railroad and to keep in repair every public road crossing such railroad for a distance of ten (10) feet on each side of such railroad track and between the rails thereof; Provided, That the provisions of this Act shall not apply within the limits of any city, taxing district or incorporated town."

Section 2 of said Act provides that:

"The failure of any such company or corporation or person to comply with the requirements of section 1 of this Act shall be deemed to be a misdemeanor, and punishable as such."

It seems obvious, from the terms of this latter Act, that it applies alone to crossings at grade, and, therefore, can have no application to the overhead crossing involved in this case.

When applied to a highway already in use at the time the railroad is constructed, the charter provisions hereinbefore quoted (Shan. Code, sec. 2417) do not, in our opinion, enlarge or extend the duty imposed by the common law.

"It is a well-settled rule of the common law, resting upon the most obvious considerations of fairness and justice, that where a new highway is made across another one already in use, the crossing must not only be made with as little injury as possible to the old way, but whatever structures may be necessary to the convenience and safety of the crossing must be erected and maintained by the person or corporation constructing and using the new way." Dyer County v. Railroad, supra, p. 714.

So it is that, under the common law, the Railroad Company, when it built the railroad involved in this case, was onerated with the duty of erecting and maintaining such a bridge at the crossing in question as was "necessary to the convenience and safety of the crossing," which imports and includes all that is required by the charter provision, Shan. Code, sec. 2417.

The Act of 1889, ch. 119, supra, imposed upon the Railroad Company the duty of making and furnishing "a good and sufficient crossing" at the place in question, and of keeping same in lawful repair at its own expense.

When applied to a concrete case, we see no difference in a requirement that the Railroad Company erect and maintain "whatever structures may be necessary to the convenience and safety of the crossing," and a requirement that the Railroad Company make and furnish "a good and sufficient crossing" and keep same in lawful repair at its own expense.

The word "safety," in the statement of the common law rule, is used in a relative, not an absolute, sense. It does not contemplate a crossing absolutely safe under all contingencies.

A "good and sufficient crossing," as that phrase is used in the Act of 1889, ch. 119, supra, means a crossing suitable for the ordinary exigencies of travel upon such a road at such a place. Lyman v. Amherst, 107 Mass., 339, 346.

A similar question of legal definition was involved in the case of Richmond & Danville Railroad Co. v. Burnett, 88 Va., 538, 541, wherein it was held (with reference to the requirement that certain railroad equipment should be "in proper repair and safe condition") that the words "in sufficient repair" were equivalent to the words "in proper repair and safe condition," and that these requirements mean that the appliances should be "reasonably safe and suitable for the purposes for which they are intended."

We see no reason to conclude that the Legislature intended to impose upon Railroad Companies, with respect to the maintenance of crossings over highways, any higher duty than that of exercising ordinary care to keep the crossing (in this case the bridge) in a reasonably safe condition for public travel. There was no purpose to project the measure of liability into the field of insurance against accidental injury or death.

In 33 Cyc., at page 276, it is said:

> "The duty of a Railroad Company with regard to the maintenance and repair of bridges at crossings is not, however, any greater than that of the public authorities charged with the same duty as to other bridges along the highway."

In view of the rule thus stated in the text of Cyc., which, in our opinion, is sound, the rules of law which define the duties of municipal corporations with respect to the maintenance of public highways, and the measure of their liability for injuries suffered by travelers thereon, furnish a safe analogy and useful guide in the instant case—at least, insofar as plaintiff seeks to predicate her action on the theory that defendant failed to discharge the duties imposed upon it by reason of the construction of its railroad across the highway.

As before stated, defendant's duties as the owner of land abutting on the highway rest on somewhat different principles. It appears that defendant was the owner of the land abutting on the south side of Melrose Avenue, west of the bridge, for a distance of more than three hundred and fifty feet, which parcel of land extended southward, on the western side of the cut, for several hundred feet. The deceased lived, at the time of his death, in a cottage situated on the lot at the northwest corner of Caldwell and Melrose Avenues, and about one hundred and fifty feet, "on an air-line," from the western end of the bridge. Mrs. Bell, a sister of plaintiff, with her husband, lived in the same home. Shortly after seven o'clock in the evening of October 9, 1926, Mr. and Mrs. Bell left the home of

deceased and went across the Melrose Avenue bridge to the Nolens-ville Pike, with the intention of there boarding a street car bound for Nashville. Very soon after the Bells left the house, it was discovered that Mrs. Bell had not taken a coat which she had intended to carry with her, whereupon the deceased, in an effort to deliver the coat to Mrs. Bell before she boarded the street car, left his home, bare headed and in his shirt sleeves, with the coat under his right arm and with both hands in his trousers' pockets. It was a very dark and cloudy night and there were no street lights on or in the vicinity of the bridge. When deceased left his home in the manner just stated, there was an electric light burning, either on the porch of his home or that of a neighbor, and, by this light, he was seen by at least two witnesses, running seemingly at the top of his speed, until he reached the junction of Caldwell and Melrose Avenues, when the light was ''snapped off'' and, so far as appears, deceased was seen no more until his dead body was found in the cut shortly before daylight on the following morning.

The body of the deceased, when found, was lying at the bottom of the west side of the cut, south of the bridge, with his head toward the north and about two feet from the track, and his feet pointing ''kind of southwest.'' He was lying on his left shoulder, with a lady's coat under his right arm, and his left hand ''sort of between his legs.'' His left trousers' pocket was pulled up, wrong side out, and there was a ''fifty-cent piece'' lying between the rails about eight feet from the body and toward the bridge.

Several witnesses testified to estimates of the distance of the body of deceased south of the bridge, meaning (as the witnesses explained) the distance of deceased's head south of the point in the bottom of the cut where a line dropped perpendicularly from the southern edge of the south wall of the bridge would strike the bottom of the cut.

Plaintiff's witness Holland estimated this distance as ''somewhere between eight and ten feet.'' Plaintiff's witness Ted Vaughn said ''somewhere around twelve feet.'' Defendant's witness Brown said ''about nine or ten feet.'' Defendant's witness Meador said ''about nine or ten feet.'' Defendant's witness Quinn said that ''seven to nine feet'' would be his ''guess.'' Defendant's witness Sanders said ''something like ten feet.''

The proof shows that there was a small peach tree standing in the western wall of the cut, about three or four feet below the top edge or brow. The distance of this peach tree from the southwest corner of the bridge was measured by two of plaintiff's witnesses, and, according to one of them (McMurrey) this distance was thirteen and one-half feet, and, according to the other of the two witnesses (Vaughn) it was thirteen feet and nine inches. This peach tree

was "more of a bush" than a tree,—the diameter of its trunk being about an inch or an inch and one-half, and its limbs extending "three or four feet, at least three feet," from its trunk.

The plaintiff's witness Holland, who saw the body of deceased in the cut and examined the surroundings early Sunday morning (October 10th) testified concerning the peach tree and certain physical appearances in its vicinity, as follows:

"Q. Could you see anything up on top of the bluff which indicated where a man might have gone off or anything disturbed there? A. There was a little peach tree like there and one limb was broke off, looked like he might have walked off of there, some evidence of something going on.

"Q. Was that little peach tree, located some twelve or thirteen feet south of the bridge, a peach tree bush? A. I couldn't tell you exactly how much it was; somewhere along in there.

"Q. That is, a sort—Was it a sort of peach tree bush? A. Yes, just a little bush, small bush.

"Q. Near the top of the bluff? A. Right at the top of the bluff, yes sir.

"Q. Did it have limbs extending around, limbs towards the bridge? A. Well there was one broke off and it was pulled down like, looked like it had been fresh pulled down, just bent over.

"Q. Was that limb one that had been growing toward the bridge? A. I don't know; it was just pulled down toward the bluff.

"Q. You don't know what pulled that down? A. No, I don't know what pulled it down.

"Q. Something else that you said showed where a man might have gone off or something might have gone off; was it tracks? A. Yes sir, looked like loose dirt stirred up.

"Q. How far was that from the peach tree bush? A. That was right side of the peach tree, on the north side of the peach tree.

"Q. Toward the bridge from the peach tree, then? A. Yes, toward the bridge."

Plaintiff's witness Ted Vaughn also testified on the same subject, as follows:

"Q. Did you examine anywhere around that and did you see any signs at the peach tree? A. Yes sir, there was a limb broke off, split down off of it.

"Q. Was that a tree or was it a bush? A. A bush, it wasn't very much, I imagine something like about like that (indicating), I don't recall now.

"The Court: How big? You say 'something like that.' A. About an inch wide or an inch in diameter.

"Mr. Hatcher:

"Q. My question is, was it more of a bush, did it grow up any material distance as a tree, or was it more of a bush, did limbs grow off at the top of the ground? A. It was more of a bush, just branched out.

"Q. That is what I was getting at. How long were those limbs that branched out from it, or do you remember? A. I just don't remember how long they were; they wasn't very large though.

"Q. Anyhow, you just saw one limb that appeared to have been broken off or split off, one little limb? A. Yes sir, I think one little piece of skin was hanging to it where it was skinned down.

"Q. Was there any fence of any sort, when you got down there, that morning and examined that place, was there any fence of any sort leading out from the southwest corner of the bridge? A. No sir, there was not.

"Q. Or along the top of the bank or along the margin of the street? A. No sir. . . .

"Q. Mr. Vaughn, you say you made some measurements? A. Yes sir.

"Q. Did you measure the distance from the south margin of the bridge to the peach tree? A. Yes, sir.

"Q. What was that distance? A. It was 13 feet, 9 inches, I believe.

"Q. Did you measure the distance from the peach tree down to the bottom of the cut? A. Yes sir.

"Q. How far was that? A. Around 30 feet. I won't be exact on that. I have that set down on my notes at the office but I didn't bring them with me.

"Q. But that is your best recollection? A. Yes, sir, something around thirty feet, from the cut up to where the peach tree was.

"Q. And you say the peach tree was a tree about an inch or inch and a half in diameter? A. Something like that; just a small bush. I would't be positive just how big it was.

"Q. You didn't measure that? A. No sir.

"Q. That is your recollection, that it was a good sized bush, peach tree bush? A. Yes sir, it was a bush.

"Q. There was a fresh broken limb on it, as you say, I believe? A. Yes sir.

"Q. That limb was stripped down and was hanging by a little piece of the skin? A. Yes sir.

"Q. It wasn't clear loose at the time you were there? A. No sir.

"Q. Freshly broken? A. Yes sir.

"Q. I will ask you if you didn't notice also where the dirt was disturbed there and if there wasn't a footprint there? A. Yes sir. That was up above, however, from the peach tree, back four feet and some few inches.

"Q. You noticed that, you say, a footprint there? A. Yes, sir.

"Q. And the dirt was kicked up like a foot had been in there? A. Where it was sliding like.

"Q. Where the foot was sliding? A. Yes sir.

"Q. And that was four feet west of the peach tree? A. Yes sir, back west of it.

"Q. I will ask you if you also saw any indications of where a man had been along angling toward Melrose Avenue there? A. I noticed some weeds there where the weeds were down, where there was tracks of something through there. Of course, I couldn't tell they were tracks, only by the weeds being knocked down.

"Q. That was running angling back towards Melrose Avenue? A. Yes sir.

"Q. Here is the peach tree on this map marked 'P. T.' there? A. Yes sir.

"Q. That is about where the peach tree was, as you recollect, south of the bridge? A. Yes sir.

"Q. I believe this measurement shows $13\frac{1}{2}$ feet, and your measurement was 13 feet and 9 inches? A. And 9 inches, yes sir.

"Q. Now, you say up here, west of the peach tree about 4 feet you saw that footprint? A. Yes sir.

"Q. Then you say you saw, angling across toward Melrose Avenue there, it looked like the weeds were disturbed or a track of something of that kind? A. Yes sir.

"Q. Where somebody had been along there? A. Yes sir.

"Q. Now, Mr. Vaughn, how far would you say it was on a line from the peach tree over to Melrose Avenue about the way you saw that way tracked out there? A. I didn't measure that, Judge, but from the distance from the bridge to the peach tree and then angling across there, I would imagine it would be about 20 or 25 feet.

"Q. In other words, it looked like whatever had gone along there had hit the weeds and grass about 20 to 25 feet and went across there before they got to the peach tree? A. Yes sir.

"Q. Or top of the bluff there at the peach tree? A. Yes

sir, you see, the peach tree sets down over the bank a little and the bank slopes up before it starts down.

"Q. It was about four feet from there where you saw the footprint? A. Yes sir.

"Q. The footprint was up on top of it? A. Yes sir, just at the break of it.

"Q. That was high weeds and grass wasn't it? A. Yes sir.

"Q. And it was also very rough in there, not even rock? A. After you got over the bend, it was, yes sir. . . .

"Q. Mr. Vaughn, will you come here and mark about where you saw those prints like a man had been along there; just take the ruler and mark it? A. This is the peach tree here.

"Q. Yes. You take the ruler and show where the disturbed condition of the weeds and the grass would be? A. (Witness indicates.)

"Q. Something like that? A. Yes sir.

"Q. Now, that is up to the line marked 'path' there; what is that distance? A. This is the tree there?

"Q. Yes. A. That shows two inches.

"Q. If this map is drawn to a scale of twenty feet to the inch, it would be about 40 feet? A. Yes sir. . . .

"Q. Now, did you make your view and examination of the land along there by the peach tree and those measurements and things—I believe you said that you did that after you came back from the undertaker's shop? A. Yes sir, that was done afterwards.

"Q. Now, there were persons around there at that time were there not? A. Yes, there were several people around there.

"Q. Who had been over and walked around where you have drawn the line for Mr. Seay there, and what individuals had stepped over there in the region of the peach tree you have no way of knowing? A. No sir, I couldn't say who did it.

"Q. You have mentioned a footprint; was that a well defined footprint, or just a scraping of the ground as if made by a foot? A. It showed like a heel had slid down on the ground, there was a fresh slide.

"Q. Just a slide like a heel in there? A. It showed it was a shoe track, you could tell that.

"Q. And you saw that there after you got back from the undertaker's shop? A. Yes sir.

"Q. Up in the morning some time; about what hour, as near as you can place it—I don't care about you being accurate and I am not going to hold you to any close approximation? A. It was after breakfast sometime. I would hate to say because, to tell you the truth, I don't recollect now what time, but it was up in the morning and before dinner.

"Q. Anyway, it was after you had been to the scene of the accident and gone from there to the undertaker's shop, where the inquest was held, and then back out to the scene of the accident? A. Yes sir."

The record shows that the peach tree is thirty-two feet, by the most direct route, from the macadam on Melrose Avenue. There are no sidewalks on Melrose Avenue, except on the concrete bridge. The space on the south side of Melrose Avenue where the sidewalk would ordinarily be located, if one was built, was, at the time of Evins's death, covered with weeds growing out of a rough and rocky surface, but there was a narrow, beaten footpath through these weeds to (and connecting with) the western end of the concrete sidewalk on the south side of the bridge. The land owned by defendant Railroad Company abutting on the south side of Melrose Avenue and extending westward and southward to and along the cut, was covered with high weeds and a rough surface.

Adopting the natural inference to be drawn from the testimony of plaintiff's witnesses Holland and Vaughn, hereinbefore quoted, (which is undisputed) defendant's counsel present the case upon the theory that the deceased departed from Melrose Avenue a considerable distance west of the bridge, traveled thirty or forty feet across the vacant lot, or "commons," south of Melrose Avenue, and went over the brow of the cut at the peach tree.

Plaintiff's counsel, in their brief, advance a different theory as to the place where the deceased went over the top of the wall of the cut, the substance of which is embodied in an excerpt from their brief as follows:

"The proof of numerous witnesses—(at the transcript pages last above cited)—located the body as lying close to the west rail of the west track at a distance variously estimated at from 7 to 10 or 12 feet south of the line of the south edge of the bridge.

"Had Evins fallen over the embankment by stumbling and taking a 'header' over the exposed protruding west end of the south sidewalk on the bridge or the exposed protruding end of the concrete floor beam—(which we will later point out on the photographic Exhibits)—which constituted the extreme southwest corner of the bridge structure, and fallen over the rocky wall of the cut as he had to do for his body to be found where it was found—his body would naturally and probably have been just where it was discovered. In our later presentation of numerous exhibits, consisting of an accurately prepared engineer's map and numerous photographs to be later presented in detail, this will be made perfectly clear.

"Had Evins, in the dark, and trying, as he admittedly was,

to get on this bridge by traveling along its western approach, missed the bridge on account of the darkness and the angle at which the bridge was sitting, and had he stumbled over this projecting 'shoulder' or end of the concrete floor beam marking the extreme southwest corner of the bridge and right at the end of the sidewalk provided for pedestrians to enter and use at that point and running along the southern side of said bridge, or had he stumbled close to this place,—in his stumbling fall, and striking against the protruding rocks on the face of the cut as he went down, his dead body would most probably have been found just where it was found.''

The plaintiff's theory just stated necessarily discards the testimony of her witnesses Holland and Vaughn, to which we have heretofore referred, and seems to rest alone upon the contention that it is consistent with the location of the body of deceased when found in the cut.

It was the function of the jury to find where the deceased went into the cut, but it was of vital importance that the jury have proper instructions from the Court with respect to the legal consequences of their finding on his point.

Bearing in mind our previous suggestion that the rules of law which define the duties of municipal corporations with respect to the maintenance of public highways afford a safe analogy through which to ascertain the duty assumed by defendant Railroad Company by reason of the construction of its railroad across the highway, we will here advert to some authorities on that subject.

''As a general rule, the duty of a municipal or quasi municipal corporation or of a private individual to guard excavations or other dangerous places, and the resulting liability for failure to do so exists only when they are substantially adjoining the way, or in such close proximity thereto as to be dangerous, under ordinary circumstances, to travelers thereon who are using ordinary care, or, as it is sometimes stated, where they are so located that a person walking on the highway might, by making a false step, or being affected with a sudden giddiness, fall into it. No definite rule can be laid down as to how far a dangerous place must be from the highway in order to cease to be in close proximity to it, but the question is a practical one, to be determined with regard to the circumstances of the particular case, and is usually one for the jury. In determining whether a defect is in such close proximity to the highway as to render traveling upon it unsafe, that proximity must be considered with reference to the highway 'as traveled and used for the public travel,' rather than as located, and whether the way would be dangerous to a traveler so using it

is generally regarded as the proper test for determining the necessity for a barrier rather than the distance from it of the dangerous object or place. As a rule the municipality is under no obligation to put up railings or barriers to prevent travelers from leaving the traveled portion of the highway, or from leaving the highway and running into dangers on adjoining property where the way itself is safe, and is not liable to a person who so leaves the highway and is injured. And this is true even though there is nothing to mark the boundary line of the highway. In other words, barriers are intended to make the passageway safe, and not to mark or define its limits so as to warn travelers not to drive outside of them. The mere fact, therefore, that the space adjoining the highway is unsafe for travel is not enough to impose such liability, and none exists either on the part of the municipality or the owners of the premises, if, in order to reach the danger, one must became an intruder or trespasser on the premises of another." 13 R. C. L., pp. 425-427, sec. 348.

"As a general rule, the City is not required to put barriers to prevent travelers from driving off the traveled portions of the street. Barriers are not required for this purpose. They are generally required only where an obstruction or excavation is placed or made in the traveled part of the street, or where the excavation or dangerous declivity is so near the traveled part of the street that it makes it a dangerous place to pass over. In other words, barriers are intended to make the passageway safe, and not to mark or define its limits so as to warn travelers not to drive outside of them." Herndon v. Salt Lake City, 34 Utah, 65, 95 Pac. 646, 131 Am. St. R., 827, 839.

The foregoing excerpt from the opinion in Herndon v. Salt Lake City was quoted with approval by the Court in Knight v. LaGrande (Ore.), 271 Pac., 41, 61 A. L. R., 256, 263.

In the case of Puffer v. Orange, 122 Mass., 389, 23 Am. R., 368, 369, the Court said:

"A town is bound to erect barriers or railings, where a dangerous place is in such close proximity to the highway as to make traveling on the highway unsafe. Stevens v. Boxford, 10 Allen, 25; Babson v. Rockport, 101 Mass., 93; Britton v. Cunningham, 107 Id., 347. But it is not bound to do so to prevent travelers from straying from the highway, although there is a dangerous place at some distance from the highway which they may reach by so straying. Sparhawk v. Salem, 1 Allen, 30; Adams v. Natick, 13 id., 429; Murphy v. Gloucester, 105 Mass., 470; Commonwealth v. Wilmington, id., 599; Warner v. Holyoke, 112 id., 362. In the case at bar there was no dan-

gerous place, and no defect or want of sufficient railing, where the plaintiff's horse left the highway; and the dangerous place where the accident happened was reached by passing some distance over a level space, and was at a spot not in or contiguous to the highway, and which the town was not bound to guard by a railing or barrier.''

In Sparhawk v. City of Salem, 1 Allen (Mass.), 30, 79 Am. D., 700, 701, the Court said:

"It appears that the highway in question was safe and convenient for travelers throughout its entire width; and the land adjoining it was also safe and convenient to travel upon. After getting entirely outside the highway in safety, the traveler must proceed still farther in order to reach a dangerous place. If he reached that place and was injured, the want of a railing was remotely, and not immediately, connected with the injury. If cities and towns are bound to protect travelers against such dangers, by erecting railings to prevent them from straying out of the highway, it is difficult to see the limit of their liability. In passing over an unfenced plain in the nighttime, the travelers might stray away from the road to a great distance, at the risk of the town, unless they fenced in their whole highway, Or he might, by mistake, enter a private way, or an open space, such as is often left about a farmhouse; or a large public common, or an unfenced forest, and hold the town responsible for any injury he might receive there, because they had not fenced against the private way, or open space, or common, or forest. Indeed, they would be liable to him for any injury he might receive from coming in collision with any building or structure in the city by straying beyond the limits of a street in the dark, unless they provided railings along all their public streets.

"But none of the cases cited sanction the doctrine that railings are necessary merely to prevent travelers from straying out of the highway, when there is no unsafe place immediately contiguous to the way. On the contrary, these cases require the party to show that the defect which caused the injury existed either in the highway, or so immediately contiguous to it as to make it dangerous to travel on the highway itself.''

The Tennessee case of Niblett v. Nashville, 12 Heisk., 684, 27 Am. R., 755, is in accord with the cases above cited. In that case the Court said:

"We think the true rule may be stated to be, that if an obstruction or excavation be permitted which renders the alley, street, or highway, unsafe or dangerous to persons or vehicles, —whether it lie immediately in or on the alley, street, or high-

way, or so near it as to produce the danger to the passer at any time when he shall properly desire to use such highway,—it is such a nuisance as renders the corporation liable. . . .

"A party bound to keep a highway in repair and open for the passage of the public in a City by night or by day, certainly cannot be held to perform that duty by simply keeping the area of the highway free, while along its edge there is a well or excavation unenclosed, into which the passenger, by an inadvertent step or accidental stumble might fall at any time."

Citations to other cases announcing the same general principles will be found in the cases above cited and in notes thereto. See also Mineral City v. Gilbow, 81 Ohio St., 263, 90 N. E., 800, 25 L. R. A. (N. S.), 627, Note, 20 L. R. A. (N. S.), 595; Note, 40 L. R. A. (N. S.), 182; Note, L. R. A., 1916-F, p. 1281.

Now, if the deceased, while traveling over the western approach to the bridge on Melrose Avenue, in the exercise of ordinary care for his own safety, by an accidental misstep in the darkness, or by stumbling over an obstruction at the southwest corner of the bridge, fell into the cut and was thereby killed, and the jury so found, and also found that the absence of a fence, or guard rail, or other sufficient barrier, at the point where the deceased thus went into the cut was the proximate cause of his fall and resulting death, the plaintiff was entitled to recover.

When we come to consider the question as to whether an abutting property owner is liable for maintaining a dangerous excavation on his land, the authorities governing the liability of municipal corporations for unguarded excavations in or near highways are not always applicable, for "the law fully recognizes the right of him who, having the dominion of the soil, without malice does a lawful act on his own premises, and leaves the consequences of an act thereby happening where they belong, upon him who has wandered out of his way, though he may have been guilty of no negligence in the ordinary acceptation of the term. It is purely damnum absque injuria. Morgan v. City of Hallowell, 57 Me., 377." Gramlich v. Wurst, 86 Pa. St., 74, 27 Am. R., 684.

It was on the principle stated in the above quotation from Gramlich v. Wurst that it was held in Williams v. Nashville, 106 Tenn., 533, 63 S. W., 231, that a municipal corporation maintaining a rock quarry within its limits is not liable for an injury sustained by a person who falls into an excavation therein, situated away from the streets, while he, without invitation, expressed or implied, is passing, by mere license, through the quarry, as a more convenient and expeditious way of reaching home than by following the public streets.

However, an application of the maxim sic utere tuo ut non alienum laedas forbids an abutting property owner to maintain an unguarded excavation on his premises so near an existing highway as to render

travel thereon unsafe for one whe is himself in the exercise of due care. The cases on this subject are very fully digested in a series of Annotations, as follows: 26 L. R. A., 686; 5 L. R. A. (N. S.), 733; L. R. A., 1918-A, 849; 14 A. L. R., 1397.

The case of Hardcastle, Admx. v. The South Yorkshire Railway, etc., Co., 4 Hurlstone & Norman, 67, 157 English Reprint, 761, was on its facts, quite similar to the case at bar (when the present case is viewed in the aspect we are now considering it). In that case it was held that, where an excavation is made near to but not substantially adjoining a public highway, at common law no action lies against the owner of the land by a person who has strayed off the highway and fallen into such excavation.

The legal principles announced and applied in the Hardcastle case, supra, are stated in two paragraphs of the opinion (which paragraphs have been frequently quoted with approval by both English and American Courts), as follows:

"That a private injury arising from a public nuisance is the subject-matter of an action for damages is a doctrine as old as any in the common law; and if we were of opinion that the state of the reservoir in the present case was a nuisance to the footpath, and that the plaintiff was substantially in the right, notwithstanding that we thought the form of the declaration was defective, and that there was no such obligation to fence as therein alleged, we should be desirous to aid the plaintiff; but we are of opinion that she has no right of action against the defendants.

"When an excavation is made adjoining to a public way, so that a person walking upon it might, by making a false step, or being affected with sudden giddiness, or, in the case of a horse or carriage way, might, by the sudden starting of a horse, be thrown into the excavation, it is reasonable that the person making such excavation should be liable for the consequences; but when the excavation is made at some distance from the way, and the person falling into it would be a trespasser upon the defendant's land before he reached it, the case seems to us to be different. We do not see where the liability is to stop. A man getting off a road on a dark night and losing his way may wander to any extent, and if the question be for the jury no one could tell whether he was liable for the consequences of his act upon his own land or not. We think that the proper and true test of legal liability is, whether the excavation be substantially adjoining the way, and it would be very dangerous if it were otherwise,—if in every case it was to be left as a fact to the jury, whether the excavation were sufficiently near to the highway to be dangerous."

In the brief for plaintiff it is said that the Hardcastle case, supra, has been "discredited" and "rejected." Our investigations have led us to disagree with the learned and able counsel for plaintiff on this point. It is quite clear that the Hardcastle case had not been discredited or rejected, or even qualified, in England as late as the year of 1928. See 'Beven on Negligence (a standard English text book), 4 Ed. (1928), pp. 187, 192, 202, 227, 481, 545 and 552.

As the authority for their statement that the Hardcastle case has been "discredited" and "rejected," counsel quote from the opinion in Crogan v. Schiele (1885), 53 Conn., 186, 55 Am. R., 88, 90, as follows:

"There is some diversity of opinion as to the test of duty and consequent liability in cases of this kind. It is said that in England and Massachusetts the test of liability is whether the excavation be substantially adjoining the public way, so that a traveler by a false step or misstep might be endangered; and the cases of Howland v. Vincent, 10 Metc., 371; s. c., 43 Am. Dec., 442; Hardcastle v. South Yorkshire Ry. Co., 4 Hurl. & Nor., 67; Hounsell v. Smyth, 7 Com. B. (N. S.), 729, are cited on this point.

"Without stopping to inquire whether this is a correct statement of the rule in England, a different and much more satisfactory test and rule prevails in this State."

It is seen that the Connecticut Court couples together, in its criticism, two English cases, viz: the Hardcastle case and the case of Hounsell v. Smyth, 7 Com. B. (N. S.), 729. The latter case is the authority on which our Supreme Court expressly rested its decision in the case of Williams v. Nashville, 106 Tenn., 533, supra.

The excerpt from the Hardcastle case which we have quoted, supra, was quoted approvingly by the Supreme Court of Wisconsin in Klix v. Nieman, 68 Wis. 271, 274; and in Cooper v. Overton, 102 Tenn., 211, 226, 52 S. W., 183, the Court quoted with approval an excerpt from the opinion in Klix v. Nieman, supra, which quotation embraced the aforesaid quotation from the Hardcastle case.

In Gorr v. Mittlestaedt, 96 Wis., 296, 300, the Court approved and applied the Hardcastle case, saying that it is "a leading English authority cited generally on this subject and always with approval."

Some other opinions in which the Court quoted with approval the same excerpt from the Hardcastle case which we have quoted, supra, are reported as follows: Beck v. Carter, 68 N. Y., 283, 23 Am. R., 175, 180; Collins v. Decker (N. Y., 1907), 120 App. Div., 645, 105 N. Y. Supp., 357; Daneck v. Penn. Railroad Co. (1896), 59 N. J. L., 415, 59 Am. St. R., 613; Hildebrand v. Hines (1921), 270 Pa., 86, 112 Atl., 875, 14 A. L. R., 1393.

In Collins v. Decker, supra, the Court referred to the Hardcastle case and another English case (Hanley v. Taylor, L. R. 1 C. P., 53),

as having been "cited approvingly" in Beck v. Carter, supra, and then said:

> "In considering the English cases referred to in Beck v. Carter, supra, and the cases in this State bearing on the subject, I am convinced that the test of liability is whether the excavation adjoins the highway or is in such close proximity thereto that a person while on the highway, slipping, or stumbling, or making a misstep, falls into the excavation, but that such liability does not exist where the traveler deviates from the highway for ever so short a distance and becomes a trespasser before he falls. There are some dicta which seem to indicate a greater liability; but I am not aware that the property owner has ever been held liable, except as above indicated." (Page 359.)

In Hildebrand v. Hines, supra, the Court said that the Hardcastle case was "possibly the leading case on the subject;" and in an extended annotation appended to this case, on the subject of "liability of adjoining property owner for injury to one deviating from highway or frequented path," at page 406, the Annotator quoted at length from the opinion in the Hardcastle case, without suggestion that it had been in anywise discredited or rejected.

The case of Norwich v. Breed, 30 Conn., 535, claimed in plaintiff's brief as an authority for plaintiff in the instant case and as opposed to the "earlier English" rule, was based upon a Connecticut statute. In the opinion in that case, it is said:

> "In Hardcastle v. The South Yorkshire Railway Co., 4 Hurlst. & Norman, 67, the defendants made a reservoir, near to, but not adjoining a public highway, and omitted to inclose it from the way. The plaintiff's intestate by accident strayed from the way in the night, and falling into the reservoir was drowned. There the defendants had a right to make the reservoir, and no law required that they should fence it in, or required any person or corporation to erect a fence or barrier along the way to prevent travelers from straying off from it. The deceased was bound to know the law, and therefore had no right to expect such protection, and voluntarily assumed the risk of traveling in the dark without it. So that, in reference to his rights, the defendants were chargeable with no wrong and no neglect.

> "Hounsel v. Smyth, 7 Com. Bench (N. S.), 729, was a case of the same character, with this element in addition, that, the plaintiff went off from the public road and upon the defendant's land intentionally, and not by accident.

> "In these cases it was conceded that if the reservoir in the former, and the quarry in the latter, had been so near the line of way that a traveler on the way might have fallen or been

thrown therefrom directly into such reservoir or quarry, they would have constituted public nuisances, and the makers of them would have been responsible accordingly.

"Under our statute an excavation of such character and dimensions and so near to a highway as to endanger the passage of travelers, being unguarded, becomes a public nuisance, whether it adjoins the way or not, because it in fact endangers passengers on such way, and then it is the duty of the public to provide for travelers adequate security against such danger, by the erection of a fence or railing between the excavation and the way. And thus the nuisance is in effect abated.

"While then we reject the rigid test of liability propounded by the English judges, it will be perceived that the difference between us arises out of the operation of our statute, rather than from any difference of opinion in relation to the principles of the common law applicable in cases of this kind."

In the case of B. & O. Railroad Co. v. Boteler, 38 Md., 568, cited for plaintiff, the Railroad Company was sued as the proprietor of a toll bridge across the Potomac River at Harper's Ferry. In that case, the Court cited the Hardcastle case and conceded the correctness of its doctrine, but rested its decision upon the duty of the Railroad Company with reference to the construction of the bridge and its approaches, and not upon the duty of the Railroad Company as the owner of land abutting on the highway—the plaintiff Boteler being upon the embankment constructed by the Railroad Company as an approach to the bridge, when, in the darkness, he walked off the highway and about ten or fifteen feet across an intervening strip of ground belonging to the Railroad Company, which intervening ground was leveled off smooth, with nothing to indicate the line of the highway or to distinguish the highway from the contiguous ground across which Boteler walked to the edge of an unguarded precipice over which he fell and was injured.

We think the opinion in the Hardcastle case, supra, contains a sound exposition of the existing common law; and there is no statute in Tennessee, so far as we are aware, which purports to impose any duties upon the owner of land abutting on a highway, with respect to excavations on his premises.

It results from the views above stated that, if the deceased, before reaching the bridge, or the approach thereto, passed off of Melrose Avenue onto defendant's land south of Melrose, and traveled across the vacant lot of defendant, for thirty or forty feet, to the brow of the cut at or near the peach tree, and in that manner reached and went over the precipice into the cut, the case is governed by the principles announced in Hardcastle v. South Yorkshire Railway Company, supra. See Hildebrand v. Hines, supra; Daneck v. Penn.

Railroad Company, supra; Gorr v. Mittlestaedt, supra; Klix v. Nieman, supra; Collins v. Decker, supra.

The "approach" to the bridge only includes the embankment, or other made or prepared structure, necessary to reach the bridge proper from the original level of the street, and if the deceased wandered from Melrose Avenue onto the land adjoining Melrose on the south, before reaching the "approach" to the bridge (as the testimony of plaintiff's witness Vaughn tends to show), the defendant's liability or non-liability is not to be determined with reference to its statutory or common law duty to erect and maintain a good and sufficient crossing over its railroad, but, as above stated, it is to be determined with reference to the duty which the owner of land abutting on a highway owes to a traveler on the highway, as that duty is defined in the Hardcastle case, supra, and other cases in accord therewith.

In his charge, the learned trial judge instructed the jury as follows:

"In this case it is insisted by the plaintiff that at the time her husband, B. W. Evins, met his death by going over a precipice, they had only lived at their then home for a short time, about a week, and that their location on Caldwell Avenue necessitated the use of Melrose Avenue and the bridge and its approaches on same when deceased went to and from his work as a fireman on the Tennessee Central Railroad; that necessarily, by his limited use of this route, he was not familiar with all the surroundings and conditions existing about this bridge and its approach. Further, it is insisted that the highway, that is, Melrose Avenue, did not run straight into the bridge, but that you approached the bridge, when going in an easterly direction on Melrose Avenue, with the road curving to the right, making the entrance onto the bridge at an angle, while the bridge crossed the railroad cut and its tracks at right angles thereto and from 25 to 27 feet above the railroad tracks at the bottom of the cut.

"It is further insisted that immediately under and commencing at the southwest corner of this bridge maintained by the defendant company, there was the margin of this precipice or cut and that same was negligently maintained and kept by the defendant, without any fence, barrier or warning either along the southern margin of the western approach to said bridge or along the western margin of the brink of said railroad cut at or in the vicinity of the southwest corner of said bridge, for the purpose of keeping the traveler undertaking to use the traveled way over said bridge and the approach thereto from the west, while in the exercise of ordinary care, from getting out of and beyond the limits of the traveled way constituting

the western approach to said bridge and unintentionally and inadvertently in the dark falling over the brink of said railroad cut at a point near the southwest corner of said bridge.

"It is further insisted and said that along by the southerly margin of the roadway, a short distance before the bridge is reached, going in an easterly direction on Melrose Avenue to the southwest corner of the bridge in question, there was a path. It is further insisted that on the night of October 9, 1926, that plaintiff's husband, the deceased, left their home to go to the street car line in a trot or run to carry a garment to a relative, and in going there his course would carry him from their home along Caldwell Avenue to Melrose Avenue and thence on Melrose Avenue, in a curving and generally easterly direction onto and across the bridge; and in so attempting to reach his destination, following this curving course on Melrose Avenue to the bridge and approach in question, and while in the exercise of ordinary care, in the dark, he inadvertently missed his course on the highway and the approach to the bridge and stumbled or fell into this cut, causing his death, and as the direct and proximate result of the defendant's negligence in the maintenance of the bridge and the western approach thereto while the deceased himself was in the exercise of ordinary care for his own protection and safety.

"Now, if this insistence of the plaintiff is supported by a preponderance of all the evidence in the case, then the plaintiff has made out her case and would be entitled to a verdict at your hands."

It is thus seen that the statement of the "insistence of the plaintiff" upon which (the Court told the jury) the plaintiff would be entitled to a verdict, if such "insistence" was supported by a preponderance of all the evidence in the case, did not include the state of facts which the jury might have found from the testimony of the plaintiff's witness Ted Vaughn, to-wit: that the deceased had wandered from the highway (Melrose Avenue) before reaching the approach to the bridge, and had traveled about forty feet across the land of defendant lying south of Melrose Avenue, and thence had fallen into the cut. This latter theory as to how and where the deceased reached and fell into the cut, is not mentioned in the Court's charge, except in the instructions relating to the subject of contributory negligence of the deceased. The jury was given no instructions concerning the measure of the duty of the defendant as the owner of land abutting on the highway, as distinguished from defendant's duty to erect and maintain a good and sufficient crossing over the railroad.

The jury was not instructed that it was their duty to find from

the evidence where the deceased fell into the cut. On this subject the defendant seasonably submitted a special request (No. 19) for instructions to the jury, which request was as follows:

"I further charge you, gentlemen of the jury, that you cannot speculate in this case as to where the deceased B. W. Evins went off into the cut, but you must determine this from the facts and circumstances proven before you, and if by a preponderance of the evidence in the case it is shown that the deceased met his death by falling into the cut at the peach tree bush, you will consider the liability of the defendant and the contributory negligence of the deceased accordingly. In other words, it is your duty, from the facts and circumstances of this case, to determine, if you can by a preponderance of the evidence, where the deceased fell into the cut, and in determining this you will take the facts and circumstances which have been proven. You will consider the facts and circumstances as to the peach tree being bent, or a portion of it broken off, there being footprints just to the west of it, and if you find from the evidence that such conditions existed at or near the peach tree, you will consider these circumstances and facts, if you find them to be facts, along with all the other facts and circumstances of the case to determine where the deceased fell into the cut."

The trial court refused to give the jury the instructions thus requested, and its refusal of that request (No. 19) is made the basis of defendant's 16th assignment of error in this Court. If the latter part of said request No. 19, beginning with the words, "you will consider the facts and circumstances as to the peach tree being bent" etc., had been omitted, it would have been eminently proper to give to the jury the instructions contained in the preceding part of this request. But it is error for the trial judge to single out particular facts and give them undue prominence, or emphasize particular evidence, thus leading the jury to believe that the Court thinks such evidence of greater significance and weight than other evidence not mentioned in the charge. 14 R. C. L., pp. 780-782, sec. 48; Compress Co. v. Insurance Co., 129 Tenn., 586, 595, 167 S. W., 859.

The trial judge cannot be put in error for his refusal to give a requested instruction, unless it is strictly accurate when tendered to the Court. Railroad v. McMillan, 134 Tenn., 490, 184 S. W., 20; Railroad v. Naive, 112 Tenn., 239, 265, 79 S. W., 124; Knoxville v. Cox, 103 Tenn., 368, 372, 53 S. W., 734; Nashville Railway & Light Co. v. Harrison, 5 Tenn. App. R., 22, 37; Tenn. Cent. Railway Co. v. Melvin, 5 Tenn. App. R., 85, 97; N. C. & St. L. Railway v. Graham, 5 Tenn. App., 121, 126. Because of the improper matter contained in the latter part of defendant's 19th request, as before indicated, the 16th assignment of error is overruled.

Through its 15th assignment of error, the defendant says that

the trial court erred in refusing to submit to the jury its special request No. 18, relating to the place where the deceased fell into the cut, which request was as follows:

"I further charge you, gentlemen of the jury, that in determining the question as to defendant's liability and in determining the contributory negligence of the deceased, you should consider all the facts and circumstances of this case which show or tend to show where the deceased fell into the cut, and if you find from a preponderance of the evidence that the deceased fell into the cut at or about the point where the peach tree bush was located, and you further find that this was some 13½ to 14 feet south of the bridge, and you further find that the deceased went diagonally across the property of the Railroad Company after leaving the traveled portion of Melrose Avenue, you should consider the distance which the deceased traveled through the grass and weeds and over the rough surface, if you find that he did do so. And you should consider whether or not the deceased was warned by the condition of the ground that he was off the highway and going into dangerous territory, and you should further consider whether a man in the exercise of ordinary care situated as the deceased is shown to have been situated and with a knowledge of conditions which the deceased is shown to have had, would have stopped before going into the cut, and you find that notwithstanding this, the deceased continued on until he fell into the cut and sustained injuries which caused his death, then I charge you, under these conditions, the Railroad Company would not be liable and your verdict should be for the defendant."

Said request No. 18 offends in the same particular as the 19th request, supra, and also invades the province of the jury with respect to the subject of contributory negligence of the deceased. For these reasons, the 15th assignment of error is overruled.

Through its 14th assignment of error, the defendant complains of the refusal of the trial court to charge its special request No. 17, which was as follows:

"I further charge you, gentlemen of the jury, that if you find from a preponderance of the evidence that Melrose Avenue was paved or macadamized and in condition for safe use by a person traveling on a highway and you further find that the limits of the highway at this point were marked by the presence of grass or weeds or rough surface to the south, and you further find that conditions were such at this point as that a man in the exercise of ordinary care in daytime or nighttime could have told when he was off the traveled or safe portion of the highway and he nevertheless continued across or through the weeds and

grass and over the rough surface to a point where he became a trespasser upon the property of the Railroad Company to the south of Melrose Avenue, then I charge you such person, under these conditions, if he fell into the cut could not recover for the injuries, and if you find that the deceased B. W. Evins carelessly left the highway and proceeded across the railroad property to the cut and fell into the same and sustained injuries from which he died, then the plaintiff could not recover and your verdict should be for the defendant."

We are of the opinion that defendant's special request No. 17, above quoted, embodied a correct statement of law, pertinent to the issues made by the pleadings, and presented a theory of the case, supported by some evidence, which was not embraced or included in the Court's charge to the jury, and which was vital to the defense. The defendant was, under these circumstances, entitled to have its theory submitted to the jury, and refusal of such instructions was prejudicial error. 14 R. C. L., pp. 793, 799, 800; Kendrick v. Cisco, 13 Lea, 247, 251; Railroad v. Egerton, 98 Tenn., 541, 544, 41 S. W., 1035; Memphis Street Railway Co. v. Newman, 108 Tenn., 666, 669, 69 S. W., 269; Nashville Railway & Light Co. v. Harrison, 5 Tenn. App. R., 22, 37.

In Memphis Street Railway Co. v. Newman, supra, the trial judge gave the jury elaborate instructions as to the law deemed applicable to the plaintiff's theory of the case, but omitted any instructions with reference to defendant's theory. To supply this omission, the counsel for the defendant tendered a special request containing a statement of the defendant's theory, which request the trial court refused. In disposing of an assignment of error based on the refusal of said request, the Supreme Court said:

"This request was refused, and the case went to the jury without any direction as to the verdict to be rendered if the defendant's version of the facts should be believed. Therein vital error was committed against the defendant, and the consequence of that error is not avoided by the suggestion of plaintiff's counsel that the Court, in the charge given, submitted a proposition more favorable to the defendant than that requested and refused. No speculation can be rightly indulged along the line of that suggestion. It is enough that the proposition referred to as having been given did not, under any legitimate interpretation, embrace the theory of fact presented by the defendant's witnesses.

"It is the indisputable right of every litigant, upon seasonable and appropriate request, to have every material issue of fact on which he has introduced material testimony submitted to the consideration of the jury with proper legal direc-

tions in respect of the verdict to be returned, upon the hypothesis that such testimony shall be found to be true. Or, differently stated, every litigant with testimony tending to sustain it is entitled, on proper request, to have his theory of every material issue of fact submitted to the jury on a correct charge of the applicatory law. Souey v. State, 13 Lea, 472; Railroad v. Egerton, 98 Tenn., 541; Wooten v. State, 99 Tenn., 195.

"The present defendant was denied that right, and through that denial it may have lost its opportunity for a favorable verdict. This renders the error material and reversible. That the refused request for instruction was sound in law is too obvious to allow debate or require the citation of authorities. Reversed and remanded."

And so, in the instant case, we are of the opinion that the error of the learned trial judge in refusing to give defendant's special request No. 17 to the jury was "material and reversible," and the defendant's 14th assignment of error is sustained.

The defendant's 4th assignment of error is that the trial court erred in charging the jury as follows:

"There is a presumption that arises out of the well-known instinct of self-preservation, that a deceased person was in the exercise of ordinary care at the time of his injury and death, and this presumption will prevail until overcome by competent evidence. This presumption is not conclusive, but is a presumption of fact which is disputable, the presumption of ordinary care standing only so long as it is consistent with all the other evidence introduced in connection with the accident."

We do not find any reversible error in that part of the charge assailed by the 4th assignment of error. See Jones on Evidence (2 Ed., 1926), Vol. 1, sec. 257; T. C. Railroad Co. v. Herb, 134 Tenn., 397, 401, 183 S. W., 1011; Memphis Street Railway Co. v. Carroll, 141 Tenn., 265, 267, 209 S. W., 640; T. C. Railway Co. v. Melvin, 5 Tenn. App. R., 85, 98; L. & N. Railroad Co. v. Frakes & Payne, 5 Tenn. App. R., 593, 608.

The jury could not reasonably have understood this instruction to mean that they might consider the presumption arising from the instinct of self-preservation in opposition to evidence touching the conduct of the deceased at the time under investigation. If the presumption stands "only so long as it is consistent with all the other evidence introduced in connection with the accident," it follows that the presumption disappears when credible evidence inconsistent with the presumption is introduced.

Through its 8th and 18th assignments of error the defendant complains of the action of the trial court in refusing to give to

the jury defendant's 4th and 24th requests for special instructions relating to "the presumption that arises out of the well-known instinct of self-preservation." Each of these requests undertakes to point out and emphasize certain facts and circumstances, as tending to rebut the aforesaid presumption, in such way as to give them undue prominence, in violation of the rule which we have heretofore stated in disposing of the 16th assignment of error. The 4th, 8th and 18th assignments of error are overruled.

Through its 3rd assignment the defendant asserts that the trial court erred in charging the jury as follows:

"It is the duty of the Railroad Company to use ordinary care to guard or warn persons who are using the highway over the railroad bridge and the approach thereto, and who are in the exercise of ordinary care, and to anticipate those things that a user might do while in the exercise of ordinary care, and to take reasonably prudent precautions accordingly."

In the instruction thus challenged by the 3rd assignment of error, the Court was dealing with the duty which the defendant owed to travelers on the bridge and approach thereto. If the words "or warn" had been omitted, this instruction would have been altogether accurate. However, when this part of the charge is read in connection with the pleadings and evidence, we do not perceive any way in which the jury could reasonably have been misled to the prejudice of the defendant by the inclusion of the words "or warn" in the excerpt from the charge criticised by the 3rd assignment of error, and that assignment is overruled.

Defendant's 5th, 6th and 7th assignments of error complain of the action of the trial court in refusing to give to the jury defendant's special requests, numbered 1, 2 and 3, for instructions relating to the measure of damages.

It is not claimed that there was any affirmative error in the charge of the Court on this subject, which was as follows:

"If your verdict be for the plaintiff, then you will go further and assess the damages and at such an amount as will reasonably compensate the plaintiff for the pecuniary value of the life of the deceased, to be determined upon a consideration of his expectancy of life, his age, the condition of the deceased's health and strength, his capacity for labor and for earning money through skill in any art, training, profession, occupation or business and his personal habits as to sobriety and industry; all modified, however, by the fact that the expectancy of life is at most only a probability based upon experience, and also by the fact that the earnings of the same individual are not always the same and uniform."

The instructions thus given were correct. Davidson-Benedict Co. v. Severson, 109 Tenn., 572, 614-615, 72 S. W., 967.

In its request No. 1 the defendant asked the Court to charge the jury that "if it appears from a preponderance of the evidence that the deceased, B. W. Evins' death was instantaneous after the injuries to his head and neck, there can be no recovery for damages for mental and physical pain or suffering."

The principal feature of request No. 2 was that in arriving at the pecuniary value of the life of the deceased, the jury could not take his average earnings for a year and multiply it by his expectancy of life and so arrive at the amount of damages; neither could the jury take the value of the earnings for twelve months and figure what amount of money would, at interest, be required in order to yield a return of this amount; that neither of these figures would represent the amount of damages which the jury could award in this case.

And by its request No. 3 the defendant sought to have the jury instructed that, in considering the measure of damages, they could not include anything on account of the grief and mental suffering of the widow and children occasioned by the death of the deceased, nor on account of the loss of the companionship, advice, protection, assistance, comfort, moral aid, and counsel of the deceased, called solatium.

The record shows that, in closing the argument for the plaintiff before the jury, one of plaintiff's counsel (Mr. McConnico) stated that the Court had informed him that, in view of the stipulation, there could be no recovery in this case for pain and suffering; and, in this connection, Mr. McConnico stated that the plaintiff now was not seeking any recovery for anything but the pecuniary value of the life of the deceased, with no recovery for pain and suffering being sought in the case; that Mr. McConnico then repeated an argument of his associate counsel (Mr. Hatcher) to the effect that reasonable compensation for the pecuniary value of the life of the deceased was all that could be recovered, and stated that certain figures and calculations which plaintiff's counsel had placed on the blackboard in the course of argument did not represent the true measure of damages, but that the measure of damages would be such an amount as would reasonably compensate the plaintiff for the pecuniary value of the life of the deceased, to be determined upon a consideration of his expectancy of life, the condition of his health and strength, his capacity for labor in his occupation, and his personal habits as to sobriety and industry; all to be modified, however, by the fact that the expectancy of life is at most only a probability based upon experience, and also by the fact that the earnings of the same individual are not always uniform.

In view of the foregoing explicit statements of plaintiff's counsel to the jury, and the clear and accurate charge of the Court with respect to the measure of damages, we are of the opinion that the defendant was not harmed by the refusal of the Court to charge the defendant's 1st, 2nd and 3rd requests; and the 5th, 6th and 7th assignments of error are overruled.

Through its 9th, 10th, 12th, 13th and 17th assignments of error the defendant complains of the action of the trial court in refusing to give in charge to the jury its special requests for instructions numbered 6, 8, 12, 14 and 22. The instructions thus requested all relate to the subject of contributory negligence of the deceased. One hypothesis (among others) upon which the 6th, 12th, 14th and 22nd requests are based is a finding by the jury that the deceased was familiar with the conditions surrounding the said Melrose Avenue bridge, or by the exercise of ordinary care could have become familiar therewith.

Interpreted in the light of the circumstances surrounding the death of B. W. Evins, as disclosed by the evidence, such instruction would naturally convey the idea that the jury could consider (in determining whether the deceased was guilty of contributory negligence) not only the degree of the deceased's familiarity with the surroundings of the crossing (which it is proper to consider) but also consider whether the deceased had previously exercised ordinary care to become familiar therewith. We are not aware of any rule of law, relating to the doctrine of contributory negligence applicable to a traveler on the highway, which goes to this extent.

The instructions contained in the 8th request are fully covered by the charge given to the jury.

For the reasons stated, it was not error to refuse the 6th, 8th, 12th, 14th and 22nd requests, and it is unnecessary to discuss other objections urged thereto. The 9th, 10th, 12th, 13th and 17th assignments of error are accordingly overruled.

The 11th assignment is that the trial court erred in refusing to submit to the jury defendant's request No. 10, which was as follows:

"I further charge you, gentlemen of the jury, that no duty rested upon the Railroad Company to light the street or the bridge or the approaches thereto where the bridge crosses over the cut on Melrose Avenue, and you cannot predicate liability against the defendant for failure to have lights on the bridge or on the streets or roadway approaching the bridge."

It was shown by the testimony of witnesses at the trial that there were no lights at or in the vicinity of the bridge. This testimony was competent for the purpose of disclosing the conditions surrounding the deceased at the time under investigation. But the law did not impose a duty on defendant to maintain lights on the bridge or

in its vicinity (King v. Central of Georgia Railway Co., 107 Ga., 754, 761), and the plaintiff's declaration does not purport to predicate liability on a failure to maintain such lights at the time of the death of B. W. Evins.

When plaintiff sought to prove that there were no lights on the bridge or in that neighborhood, defendant's counsel objected on the ground that plaintiff "couldn't make that a basis of liability"— that there was no "ground in the declaration for failure to light the bridge or alleging that there was any duty on the Railroad Company to light the bridge"—and the Court overruled the objection without instructing the jury, either then or thereafter, that they could not predicate liability on the failure of defendant to maintain lights at the locus in quo. We are of the opinion that the defendant was entitled to have its special request No. 10 given to the jury, and the 11th assignment of error is sustained.

Through its 20th assignment, the defendant seeks to predicate error upon the admission, over defendant's objection, of certain testimony of the plaintiff's witness E. E. Harris. The testimony of this witness copied into the assignment relates to two independent subjects, which will be considered separately.

E. E. Harris testified as follows:

"Q. At that time, now, just following the removal of the body, on that Sunday morning was there any fence running up to the southwest corner of the bridge? A. No, sir.

"Q. Prior to that time had you ever known of any fence attached to the southwest corner of the bridge? A. Yes, sir.

"Q. How did that fence run? A. It ran, the yard fence from this house here, coming down alongside of the street, fastened to the bridge right at the corner.

"Q. Then, as I understand, there was a fence running alongside of the house that appears on the map to the south of Melrose? A. Yes, sir.

"Q. That was what sort of a fence? A. As well as I remember, it was a wire fence.

"Q. That fence ran alongside of that house and between that house and the traveled portion of the street and attached onto the southwest corner of the bridge? A. Yes, sir.

"Q. When was that fence entirely gone, if it was—you say there was none at the time the man was killed, how long had that fence been down and gone? A. I couldn't say, exactly; it gradually went down and disappeared. I couldn't state.

"Q. I know you can't, but can you give us any idea of how long before Mr. Evins was killed it was that the fence was gone and away from the southwest corner of the bridges? A. That fence had been gone some little bit. I couldn't say. I would say three or four months or six months, something like that."

It is seen that the substance of the above quoted testimony of E. E. Harris (aside from the admitted fact that there was no fence at the southwest corner of the bridge at the time of Evins's death) is that, over some indefinite perior of time anterior to October 9, 1926, there had been a "yard fence" at the house on the south side of Melrose Avenue (known in the record as the Barnes house, which was directly across Melrose Avenue from the Evins house), which fence extended from the Barnes house along the south side of Melrose Avenue to the southwest corner of the bridge and was attached to the bridge at that point; that said fence "gradually went down and disappeared," and that it had been gone "three or four months or six months, something like that," when Evins lost his life.

There is no proof as to when or by whom the fence described by Harris was erected. The issue was whether the defendant was under a legal obligation to fence its land south of Melrose Avenue. The fact, if proven, that there had formerly been a fence, as described by the witness Harris, did not create such an obligation, and the disappearance of a fence which defendant was under no legal obligation to maintain would not create any liability on the part of defendant. Neillson v. Worcester, 219 Mass., 88, 106 N. E., 579, 3 A. L. R., 1120, 1121.

The view just stated was presented to the trial court when the testimony was offered. The record shows that defendant's counsel then said:

"My objection, if your Honor please, to the question of the fence on the right hand side, that is, the side where the deceased in this instance is alleged to have fallen over into the cut, is that it is not material in any aspect of this case; that the question we have here is: What was the situation at that point at the time of this accident. Now that is the thing we have here, what was the situation then. That is the thing we are going to try, that is what your Honor, if we were trying this case before your Honor without a jury, would consider: Was that a dangerous situation, and such a situation as made it the duty of the Railroad Company to protect it by a barrier."

We think that part of the testimony of E. E. Harris hereinbefore quoted was not competent and should have been excluded, and, to that extent, the 20th assignment of error is sustained.

The remainder of the testimony of E. E. Harris quoted in the 20th assignment of error is to the effect that, in the year of 1921, the witness came near falling into the cut at the northwest corner of the Melrose Avenue bridge, and that he thereafter reported such near-accident to certain police officers of the defendant Railroad Company.

The 21st assignment of error complains of the admission, over

defendant's objection, of the testimony of plaintiff's witness Mrs. Mike Ward to the effect that sometime before the death of B. W. Evins this witness and her little daughter, in the nighttime, came near walking into the railroad cut on the south side of the Melrose Avenue bridge.

The 22nd assignment of error is based on the admission, over defendant's objection, of certain testimony of defendant's witness E. F. Allen (elicited on cross-examination by plaintiff's counsel) to the effect that the witness, on a dark and rainy night about two years before the death of Evins, came near falling into the western side of the said railroad cut south of the Melrose Avenue bridge.

The testimony of E. E. Harris, Mrs. Mike Ward, and E. F. Allen, quoted in the 20th, 21st and 22nd assignments of error, respectively, occupies several pages of the transcript, and we will not extend this opinion by copying same herein.

The question of the admissibility, in negligence cases, of evidence of previous accidents, or near-accidents, at the place where the accident under investigation occurred, is one upon which the Courts are very much divided, and we shall not undertake, in this written opinion, to analyze the cases and array the authorities. The state of the text law and the current of judicial decision on this subject may be seen from the following citations: Jones on Evidence (2 Ed., 1926), Vol. 2, sections 680-684, pp. 1264-1275; 45 C. J., p. 1246; Thompson on Negligence, Vol. 6, sec. 7849; Case Note, 32 L. R. A. (N. S.), pp. 1101-1117; 10 R. C. L., pp. 940-942, sec. 110; 8 Ency. of Evidence, pp. 928-930; Railroad v. Howard, 112 Tenn., 107, 113, 78 S. W., 1098; John Gerber Co. v. Smith, 150 Tenn., 255, 264, 263 S. W., 974; Ellis v. Cotton Oil Co., 3 Hig., 642, 649; City of Nashville v. Fox, 6 Tenn. App. R., 653, 663.

Our conclusion is, and we hold, that there was no reversible error in the admission of the testimony of E. E. Harris with respect to his near accident at the Melrose Avenue bridge, or in admitting the testimony of Mrs. Mike Ward and E. F. Allen copied into the 21st and 22nd assignments of error. It follows that, insofar as the 20th assignment of error complains of the ruling of the trial court with respect to this testimony, it is overruled, and the 21st and 22nd assignments of error are likewise overruled.

The nineteenth assignment of error is that the Court erred in refusing to submit to the jury, after the regular charge, defendant's request No. 25 for special instructions to the jury; and said request No. 25 is copied into the assignment. The major part of the instructions thus requested are sound, but the request is vitiated by the inclusion therein of an instruction as follows:

"I further charge you that the proof in this case fails to show any defect in the bridge and approaches thereto, and I therefore

direct you that the statutes relied upon in the second count of the declaration have no application to this case, and you will find for the defendant on the second count.''

As we have heretofore stated, the bridge itself (meaning the concrete structure) was substantial, commodious, and entirely sufficient for the purposes for which it was designed; but there was evidence from which the jury might have found that the entrance to the concrete sidewalk at the southwest corner of the bridge was not in a reasonably safe condition for pedestrians approaching the bridge from the west. It would, therefore, have been error for the Court to have charged the jury that the proof fails to show any defect in the bridge and approaches thereto. Of course, if such defect was not the proximate cause of the death of B. W. Evins, or if his negligence was a contributing proximate cause of his death, no liability could be predicated on such defect; but these were all matters for the determination of the jury. The nineteenth assignment of error is overruled.

Through its first assignment of error the defendant says that there is no evidence in the cause to support the verdict of the jury, nor the judgment of the Court thereon.

And defendant's 2nd assignment is that the Court erred in overruling and in not sustaining the motion for peremptory instructions made by defendant at the conclusion of all of the evidence in the cause upon the ground that there was no evidence to support a verdict by the jury in plaintiff's favor.

As we have hereinbefore stated, it was for the jury to say how and where the deceased went into the cut. These facts were to be deduced from the circumstances in evidence (Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn. App. R., 170, 179), and we think there was room for sufficient doubt as to the proper inferences to be drawn from the circumstances to take the case to the jury. Hines v. Partridge, 144 Tenn., 219, 232, 231 S. W., 16; Mayor, etc., v. Reese, 138 Tenn., 471, 479, 197 S. W., 492.

If there was sufficient evidence to take the case to the jury, there was necessarily some evidence to support the verdict. The 1st and 2nd assignments of error are overruled.

The 23rd assignment is that the verdict of the jury is excessive, and the 24th assignment is that the verdict of the jury is excessive and so excessive as to evince passion, prejudice or caprice on the part of the jury.

As the case must go back to the Circuit Court for another trial, the consideration of the amount of the verdict will be pretermitted.

This disposes of all of the assignments of error. The 11th and 14th assignments are sustained, and the 20th assignment is in part sustained as before indicated; and for the errors thus pointed out the

judgment of the Circuit Court is reversed, the verdict of the jury is set aside, and the cause will be remanded to the Third Circuit Court of Davidson County for a new trial.

The costs of the appeal will be adjudged against the plaintiff Mrs. Carrie Bell Evins. The costs of the lower court will await the future judgment of that Court.

Crownover and DeWitt, JJ., concur.